UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUCAFINA NA INC.,<br><br>        Petitioner,<br><br>– against –<br><br>GREEN COFFEE COMPANY HOLDINGS LLC,<br><br>        Respondent. | Civil Action No. |

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION TO COMPEL ARBITRATION

Petitioner Sucafina NA Inc. (hereinafter "Petitioner" or "Sucafina") respectfully submits this Memorandum of Law in Support of its Petition to Compel Green Coffee Company Holdings LLC ("Respondent" or "GCC"), a non-signatory to certain purchase orders Sucafina has with GCC's subsidiary Agrosura S.A.S. ZOMAC ("Agrosura"), to arbitrate pursuant to the agreement of the parties, the U.N Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208 (2018) (the "New York Convention"),[1] and the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (2018) (the "FAA").

### PRELIMINARY STATEMENT

Sucafina and Agrosura are parties to a series of commercial contracts for the sale and purchase of green coffee. The contracts were entered into in October 2023 for deliveries from the 2023/2024 crop year. Sucafina alleges that Agrosura failed to deliver the contracted coffee in

---

[1] In the United States, the New York Convention has been implemented through the FAA and can be found at 9 U.S.C. ¶ 201 *et seq*. For a list of countries that are signatories (which include the U.S. and Mexico), see New York Arbitration Convention, http://www.newyorkconvention.org/countries. The New York Convention makes applicable all provisions of the FAA to the extent they are not in conflict. *See* 9 U.S.C. 208.

accordance with the agreed shipment schedules and specifications, resulting in significant delays and nonconforming performance. As a result, Sucafina incurred additional expenses and economic losses, including costs associated with delayed shipments and the need to make alternative arrangements to fulfill its own customer obligations.

In response to these breaches, Sucafina commenced arbitration against both Agrosura and GCC, a Delaware limited liability company and Agrosura's parent company.  GCC is not a signatory to the contracts but was intimately and inextricably involved in their negotiation, performance, and the resolution of disputes arising from them. Notably, GCC's involvement included direct participation in contract negotiations, ongoing logistics and shipping coordination, and the handling of claims related to Agrosura's performance failures.  And it was GCC who took the extraordinary step of terminating pending, unperformed contracts as well as all other business relationships among the parties.

The contracts between Sucafina and Agrosura each contain a broad and enforceable arbitration agreement, mandating arbitration of all disputes "relating to, in connection with, or arising out of " the contracts before the Green Coffee Association in New York City. Sucafina is a party to these contracts and the arbitration clauses contained therein, and seeks to compel GCC to arbitrate on the basis of its direct involvement and substantial performance under the contracts, under the theories of estoppel and agency, both recognized grounds for compelling a non-signatory to arbitrate.

## STATEMENT OF FACTS

1. <u>The Parties</u>

Sucafina Group is a multinational coffee merchant headquartered in Geneva, Switzerland,

#524613299_v1

with a family tradition in the commodities sector dating back to 1905. Since its founding in 1977, Sucafina Group has developed a global presence, supporting the coffee supply chain through sourcing, trading, and delivering high-quality coffee to customers worldwide. The Group's network of traders operates across key coffee-producing and consuming regions, leveraging deep market knowledge to ensure quality and value throughout the supply chain.  Petitioner Sucafina NA, with an office in New York City, was established in 2017 as an importer of green coffee after nearly 15 years of operating in the North American commercial market via an agency structure. Affirmation of Jean Robert Menos, dated July 10, 2025 ("Menos Aff."), at ¶4.

Upon information and belief, Green Coffee Company Holdings LLC is a Delaware limited liability corporation and the parent company of Agrosura. According to GCC's website, they are "Colombia's largest coffee producer and a premier supplier of high-quality Arabica coffee to the U.S. and Canadian markets."  Menos Aff. at ¶5.

As part of its corporate structure, GCC owns and controls Agrosura SAS Zomac ("Agrosura"), a subsidiary based in Salgar, Antioquia, Colombia. Agrosura operates as a green coffee exporter, facilitating the movement of Colombian coffee into international markets, including those served by Sucafina NA. *Id.*

2. <u>The Agreements to Purchase Green Coffee</u>

Sucafina and Agrosura entered into contracts for the sale by Agrosura and purchase by Sucafina of green (unroasted) coffee starting in 2021.  As "forward" contracts, the Coffee Contracts were entered into in 2023 for deliveries for the 2023/2024 harvest. *Id* at ¶7. The terms were agreed upon on standard, fairly straightforward forms that, amongst other things, identified the quantity and quality of coffee to be purchased, the crop year, the price, the shipping term, and

shipment date(s). *Id* at ¶6. There are four contracts at issue between Sucafina and Agrosura, identified as NPCO-32163, NPCO-32164, NPCO-32165 and NPCO-32166 (together the "Coffee Contracts"). *Id* at ¶7, Ex. 1. Notably, each of the four Coffee Contracts provides for arbitration of all disputes before the Green Coffee Association and pursuant to its rules. *Id.* at ¶8, Ex. 1.

3. <u>GCC's Involvement in and Performance of the Coffee Contracts</u>

Although GCC is not a signatory to the Coffee Contracts, it was substantially involved in every material aspect of the contractual relationship. Indeed, GCC participated in the negotiation and formation of the contracts, managed logistics and performance, and was actively engaged in addressing and resolving disputes arising from contract performance. GCC's representatives negotiated key commercial terms, provided financial information to facilitate the business relationship, coordinated shipping and logistics, and directly negotiated claims and penalties related to delayed deliveries. GCC's conduct was not that of a remote parent or passive affiliate; rather, it exercised substantial control and derived direct benefits from the contracts at issue.

Throughout the parties' relationship, GCC's Sales director, Jordan Crosthwaite, primarily handled negotiations and exchanged emails with Sucafina to refine the commercial terms of the purchase orders, including those that eventually became the Coffee Contracts. Menos Aff at ¶¶10 - 14. Examples of GCC's intimate involvement in the contracts with Sucafina include the following:

- March and April 2023 emails, wherein GCC's former Sales Director makes offers from GCC to sell coffee to Sucafina, for dates in 2023, as well as dates going forward from the October 2023 production (Menos Aff., at ¶ 10, Ex. 2);
- GCC's affirmative statements that sales to Sucafina under Agrosura purchase orders are

subject to GCC's confirmation (Menos Aff., ¶11, Ex. 2, at pp. 10-11);

- Discussions regarding expanding the parties' business relationship, and GCC providing its financial statement to Sucafina for review (Menos Aff., ¶12, Ex. 2, p. 1);

- GCC was involved in the logistical and day-to-day operations of the sales to Sucafina (*E.g.* Exs. 3, 5, 6 to Menos Aff.);

- GCC was involved in addressing Sucafina's claims for the late delivery by Agrosura under certain contracts in 2023/24 (Menos Aff. ¶ 14, Exs. 7, 8).

Further, it was GCC, and not Agrosura, who took the extraordinary position and terminated the unperformed Coffee Contracts in October 2024 (Menos Aff. at ¶16, Ex. 9). GCC's termination letter makes crystal clear that it was GCC who was terminating the Coffee Contracts on its own behalf, as well as on behalf of its subsidiary.

4. Agrosura and GCC breach the Coffee Contracts

Starting in late 2023, Agrosura began experiencing delays in the delivery of contracted green coffee, failing to meet agreed shipment schedules, and non-performance of key contractual obligations. *Id* at ¶15. In an effort to provide some assistance to Agrosura, Sucafina explored various alternatives aimed at extending delivery deadlines, modifying shipping terms and allowing Sucafina's Colombian subsidiary to accept delivery of the coffee at a location in Colombia (thereby modifying shipping terms from Free on Board (FOB) to Delivery at nominated place (DAP) in Colombia). *Id*

Despite Sucafina's multiple accommodations, Agrosura remained in breach of the Coffee Contracts. Then, in late October 2024, Mr. Boris Wullner, CEO for Agrosura's parent company GCC, sent an email to Sucafina, attaching a letter which was sent by GCC on GCC letterhead and

indicating he was also "acting on behalf of Agrosura," advising that GCC was terminating GCC's and Agrosura's business relationships with Sucafina and Sucafina Colombia. *Id* at ¶ 16; Ex. 9 to Menos Aff.

    5. The Arbitration

The Coffee Contracts each contain a broad and enforceable arbitration agreement, mandating arbitration of all disputes "relating to, in connection with, or arising out of" the contracts before the Green Coffee Association in New York City. Ex. 1 to Menos Aff.  Sucafina commenced arbitration against Agrosura and GCC on January 13, 2025, under the Green Coffee Association Rules for Arbitration other than Technical Grade or Quality (the "Arbitration"). Pursuant to such Rules, and the terms and conditions of the contract of the Green Coffee Association, any arbitration "shall be held in accordance with the law of New York State." The Coffee Contracts for their part, state that their "Contract includes The Terms And Conditions Of The Contract Of The Green Coffee Association Of New York City Inc. in Force At The Time Of Conclusion Of Contract…." Ex. 1 to the Menos Aff.

To date, only Agrosura has answered Sucafina's Notice of Arbitration and has asserted a counterclaim under certain other agreements it had with Sucafina's Colombian affiliate, which do not contain a NY arbitration clause and are therefore excluded from this motion and analysis.

## LEGAL ARGUMENT

This Court should compel GCC to arbitrate the claims asserted by Sucafina in the GCA Arbitration.  While GCC is a non-signatory to the Coffee Contracts, federal and New York law governing the Coffee Contracts and specifically, the arbitration agreements here, explicitly allow

6

non-signatories to be bound to an agreement to arbitrate under appropriate circumstances. This is in keeping with strong federal policy favoring arbitration.

Here, the facts overwhelmingly support an order compelling GCC to arbitrate Sucafina's claims for breach of the Coffee Contracts. These facts include, *inter alia*, GCC's own conduct, and its involvement in virtually every aspect of the parties' commercial relationship - contract negotiations and business development, contract performance, logistics, coffee deliveries and scheduling, negotiating and addressing claims for late deliveries, and ultimately GCC's leading role in walking away from the Coffee Contracts, breaching valid and binding agreements it and Agrosura had entered into to sell green coffee to Sucafina, causing Sucafina to sustain substantial damages. GCC is not simply a disinterested, indirect or remote parent to Agrosura in respect of the contractual dealings with Sucafina – GCC acted as the driving force under the Coffee Contracts. Having inserted itself into the that contractual relationship, and having driven the wrongful termination of that relationship, GCC should not now be permitted to walk away, or sit on the sidelines here.

A.  **Under the New York Convention and the FAA, GCC Should be Compelled to Arbitrate Sucafina's Claims.**

While arbitration is fundamentally a matter of contract, courts have long acknowledged that non-signatories may, in certain circumstances, be compelled to arbitrate disputes where their conduct or relationship to the signatory parties justifies such a result. This is especially relevant in the context of international commercial arbitration governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") and the U.S. Federal Arbitration Act (FAA), where courts must reconcile domestic doctrines with international

#524613299_v1

treaty obligations.

Here, both the New York Convention and, to the extent not in conflict, the FAA apply because the arbitration agreements are contained in the Coffee Contracts between Agrosura and Sucafina (Ex. 1 to Menos Aff.), and these contracts are commercial contracts involving the international sale of goods, where at least one party is not a US citizen (Agrosura) and performance is outside of the US (deliveries in Colombia). 9 U.S.C. § 202; 9 U.S.C. § 2.[2] Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "requires courts to enforce the bargain of the parties to arbitrate." *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532–33 (2012) (*quoting Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985)). This Court has authority to compel Sucafina's claims against GCC to arbitration. *See* 9 U.S.C. § 206; 9 U.S.C. § 4.

The FAA reflects a strong federal policy favoring the enforceability of arbitration agreements. *See CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) ("[Section 2 of the FAA] establishes 'a liberal federal policy favoring arbitration agreements.'") (citation omitted). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration as a result of the strong presumption in favor of arbitration. *See Granite Rock. Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298–99 (2010). The federal policy favoring arbitration is even stronger in the context of international transactions. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 629–31 (1985); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516–18 (1974); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir.), *cert. dismissed*, 501 U.S. 1267 (1991). When a court deals with arbitrability issues, any doubts regarding the scope

---

[2] Here, there is no conflict between the New York Convention and the FAA.

of the arbitrable issues must be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (1983) ("federal arbitration policy requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

In deciding whether to compel arbitration, the only issues to be considered by a court are those concerning the existence and validity of the agreement to arbitrate, and whether the claims fall within the scope of that agreement. *WTA Tour, Inc. v. Super Slam Ltd.,* 339 F. Supp. 3d 390, 399 (S.D.N.Y. 2018). The Court should assess whether the parties have agreed to arbitrate this dispute by determining: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question; and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." *Hartford Accident. & Indem. Co. v. Swiss Reinsurance Am. Corp.,* 246 F.3d 219, 226 (2d Cir. 2001). Here, the parties do not dispute that there is a valid agreement to arbitrate. In fact, Agrosura has already participated in the Arbitration, without raising any objections as to whether the arbitration agreement is valid. Menos Aff. at ¶17. The question here, then, is whether GCC, a non-signatory, may compelled to arbitrate.

## B.  **There is a valid agreement to arbitrate that binds GCC.**

The law is clear that "a party may be bound by an agreement to arbitrate even in the absence of a signature..." *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). Courts in this district, as well as other districts, have extended the interpretation of "party" to non-signatories by applying common law principles of agency, assumption, alter ego, incorporation by reference and estoppel. *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir.1999) (*citing Thomson–CSF, S.A. v. Am. Arbitration Ass'n.*, 64 F.3d

9

773, 776 (2d Cir.1995)); *see also MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F.Supp. 2d 380, 398 n. 9 (S.D.N.Y.2009). Here, GCC may be compelled to arbitrate under the theories of estoppel and/or agency as further discussed below.

1. **GCC is bound to the arbitration provision under the theory of estoppel.**

GCC extensively exploited the terms of the Coffee Contracts for its own direct benefit, and it should be estopped from arguing that it is not bound to arbitrate. A non-signatory is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause. *See Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 274 (S.D.N.Y. 2011); *see also Sunkist Soft Drinks, Inc. v. Del Monte Corp.*, 10 F.3d 753, 757 (11th Cir. 1993) (parent company was estopped from avoiding arbitration of its claims, where claims of parent company/non-signatory to license contract between its subsidiary and a third party, as well as the "integral relationship" between the subsidiary and the third party, are "intimately founded in and intertwined with" the license agreement containing the arbitration provision); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–32 (4th Cir. 1988) (stating that "[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.").

Estoppel is applicable where a non-signatory has reaped the benefits of a contract providing for arbitration but attempts to ignore burdensome or non-beneficial terms that it seems to disregard. *See, e.g.*, *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, U.S., 9 F.3d 1060 (2d Cir. 1993) (a nonsignatory received a copy of the subject contract, raised no objections to it, and made use of the trade name that was bargained-for therein, and was thus estopped from arguing it

10

was not bound by the arbitration clause). The core issue is whether the benefit gained by the non-signatory is one that can be traced directly to the agreement containing the arbitration clause. *See Life Techs. Corp.*, 803 F. Supp. 2d at 274 (binding a trademark licensee to an arbitration clause in an agreement, pursuant to which the trademark license was issued). Benefits are direct—and therefore will lead to estoppel when knowingly exploited—when arising specifically from the unsigned contract containing the arbitration clause; and benefits are indirect—and therefore will not lead to estoppel even if knowingly exploited—when merely incidental to the contract's execution. *See e.g., Tencara Shipyard*, 170 F.3d at 351–53 (shipyard's contract with classification society for classification lowered owners' insurance rates and allowed owners to fly national colors, and owners did so; non-signatory owner therefore estopped from avoiding arbitration pursuant to the classification contract between the shipyard and ABS ) and *Deloitte Noraudit,* 9 F.3d at 1061–64 (company's settlement with litigation opponent permitted affiliates to use trade name, and affiliates had knowledge of settlement and actually used trade name).

Here, GCC, while not a signatory to the Coffee Contracts, negotiated and received numerous direct benefits under those contracts: GCC had the benefit of directing the negotiations for contracts to be entered into between its subsidiary; it had final approval over sales between Sucafina and its subsidiary; it inserted itself into daily operations and logistics; and when Agrosura was late in making deliveries to Sucafina, it was GCC who was addressing Sucafina's claim for a price discount, trying to get the best deal. Menos Aff. at ¶¶ 9-14 and exhibits referenced therein. Most notably, GCC—acting on its behalf as well as Agrosura's—took the extraordinary step of unilaterally terminating all outstanding purchase orders between Agrosura and Sucafina by letter dated October 25, 2024, invoking the "agreed upon terms" of the contracts. Menos Aff. at ¶ 16 and Ex. 9.

#524613299_v1

Indeed, the correspondence among Sucafina, Agrosura and GCC demonstrates that GCC's actions went beyond mere oversight of its subsidiary: it actively managed the contractual relationship, addressed performance failures, and negotiated penalties and claims arising from Agrosura's breaches. These facts establish that GCC knowingly and purposefully availed itself of the benefits of the contracts containing the arbitration clause, and directly invoked those contracts to assert rights and manage liabilities, and purported to terminate pending contracts on its own behalf as well as of its subsidiary. The facts here amply demonstrate that GCC is estopped from denying it is a party to the arbitration agreement contained in the Coffee Contracts, and GCC should be compelled to arbitrate.

2. **GCC should be compelled to arbitrate under the theory of agency.**

The inquiry into whether there is an agreement to arbitrate is fact specific. *See, e.g., Sunskar Ltd. v. CDII Trading, Inc.*, 828 F. Supp. 2d 604, 616 (S.D.N.Y. 2011). In New York, it has long been established that traditional principles of agency law may bind a non-signatory to an arbitration agreement. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002) ("It is black letter law that an agent binds his principal when he enters into a contract within the scope of his authority."). *See also Merrill Lynch Inv. Managers v. Optibase, Ltd*, 337 F.3d 125, 130 (2d Cir. 2003) ("Traditional principles of agency law may bind a non-signatory to an arbitration agreement").

Accordingly, when analyzing whether a non-signatory (such as GCC) is bound to arbitrate under an agency theory, courts will apply federal common law agency principles to the facts to determine if an agency relationship exists between the signatory and non-signatory, and whether that relationship is sufficient to bind the non-signatory to the arbitration agreement. *See* Gary B.

Born, International Commercial Arbitration 1002 (4th ed. 2024) (Born) ("the better view is that federal common law rules of agency remain applicable in cases arising under the New York Convention and Chapter 2 of the FAA."). Courts in this district may consider extrinsic evidence to determine whether a non-signatory is bound to an arbitration agreement under the theory of agency. *Trina Solar US, Inc. v. JRC–Servs. LLC*, 954 F.3d 567, 571 (2d Cir.. 2020) ("New York courts have long held that '[u]nless the contract explicitly excludes the principal as a party,' a court may consider extrinsic evidence to identify an unnamed principal to the contract, or to determine, more specifically, whether a nonsignatory is bound by the contract as a principal," citing Restatement (Third) of Agency § 6.01 cmt. (other citations omitted).

A principal may be bound to an agreement signed by its agent if the agent acts with actual or apparent authority. *Hidden Brook Air*, 241 F. Supp.2d at 260. Actual authority exists when an agent has the power "to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestation to him." *Id*. (quoting *Minskoff v. American Exp. Travel Related Servs. Co*., 98 F.3d 703, 708 (2d Cir.1996)). Actual authority is "[a]uthority distinctly, plainly expressed, orally or in writing." *Nationwide Life Ins. Co. v. Hearst/ABC–Viacom Entm't Servs*., No. 95 Civ. 10545 (S.D.N.Y. May 17, 1996),1996 WL 263008, at *8, while implied authority exists "when verbal or other acts by a principal reasonably give the appearance of authority to the agent." *99 Commercial St., Inc. v. Goldberg*, 811 F. Supp. 900, 906 (S.D.N.Y. 1993).

Here, GCC's words and conduct demonstrate that it consented to have Agrosura enter into the Coffee Contracts on GCC's behalf, with Agrosura acting as a selling agent for GCC.³ Throughout the parties' relationship, GCC's Sales director, Jordan Crosthwaite, primarily handled

---

³ *See, e.g., Farkar Co. v. R.A. Hanson Co*., 583 F.2d 68 (2d Cir. 1978)(subsidiary acted as parent's selling agent for foreign sales, and binding non-signatory parent to arbitration agreement under an alter ego theory).

#524613299_v1

negotiations and exchanged emails with Sucafina to refine the commercial terms of the purchase orders, including those that eventually became the Coffee Contracts. Menos Aff at ¶¶10 - 13. As discussed herein, there is ample evidence of GCC's intimate involvement in the contracts with Sucafina. *See* Menos Aff. at ¶ ¶ 10-14, Exs. 2-9. And it was GCC, not Agrosura, who took the extraordinary position and terminated the Coffee Contracts containing the arbitration provision at issue in October 2024 (Menos Aff. at ¶16, Ex. 9). GCC's termination letter makes crystal clear that it was GCC who was terminating the Coffee Contracts on its own behalf, as well as on behalf of its subsidiary.

It is clear here that GCC is not an innocent bystander, a disinterested parent company lurking in the background. Rather, there can be no doubt that GCC acted as a disclosed principal here in all respects, to Agrosura's agency role: it negotiated the contracts, was involved in performing the contracts, and eventually, played the lead role in breaching the contracts with its wrongful termination of the Coffee Contracts. Agrosura clearly entered into the Coffee Contracts, and the agreement to arbitrate disputes under the GCA Rules, on behalf of and under the control of GCC, as well as on its own behalf. Accordingly, GCC should be compelled to respond in the pending arbitration and answer – along with Agrosura - for its wrongful termination of the contracts.[4]

### C. Sucafina's Claims Fall Within the Scope of the Arbitration Provision.

Finally, there is no real dispute that Sucafina's claims fall within the scope of the arbitration provision at issue. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in

---

[4] *Tencara*, 170 F.3d at 353 (agent and owner compelled to arbitrate, rejecting agent's effort to avoid arbitration based on "the mistaken notion that a party must be either solely a principal or solely an agent"; agent may also be a party to the agreement and responsible for performance).

14

favor of arbitration...." *Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. at 3353–3354 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1982)). This strong federal policy favoring arbitration is particularly compelling where, as here, the arbitration clauses are broad and encompass all "controversies relating to, in connection with, or arising out of" the Coffee Contracts. Ex. 1 to Menos Aff.

Application of these principles compels arbitration in this case. The core of the Coffee Contracts was the supply of green coffee to Sucafina, a relationship that, in practice, involved not only Agrosura—the named signatory—but also GCC, who played a direct and substantial role in contract negotiation, performance, and ultimately, termination. The dispute pending before the GCA centers on Agrosura's and GCC's refusal to sell and deliver to Sucafina coffee, as required under the Coffee Contracts. Moreover, at issue is whether the October 2024 termination letter, drafted and issued by GCC, constitutes a breach of the Coffee Contracts. Because the claims arise directly from the performance and enforcement of the Coffee Contracts, and because GCC's conduct is inextricably intertwined with the contractual relationship, the dispute plainly falls within the scope of the arbitration clauses. Accordingly, this Court should compel arbitration of all claims against GCC under the broad arbitration agreements governing the parties' relationship.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court grant its Petition to Compel Arbitration pursuant to 9 U.S.C. §§ 201 *et seq.* (the New York Convention)*,* and 9 U.S.C. §§ 1 *et seq.* (the FAA), and enter an order compelling Green Coffee Company to arbitrate all of its claims in this matter, and for such other or further relief that this Court deems just or appropriate.

Dated: July 11, 2025

          Respectfully submitted,

          By:   */s/ Marisa Marinelli*
          Marisa Marinelli
          Carolina Lopez
          HOLLAND & KNIGHT LLP
          *Counsel for Petitioner*
          787 Seventh Avenue
          New York, NY 10019
          Telephone: (212) 513-3200
          Facsimile: (212) 385-9010
          Email: marisa.marinelli@hklaw.com
          carolina.lopez@hklaw.com