UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUCAFINA NA INC.,<br><br>       Petitioner,<br><br>  -against-<br><br>GREEN COFFEE COMPANY HOLDINGS,<br>LLC,<br><br>       Respondent. | |

Case No. 1:25-cv-05752 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

In October 2023, Petitioner Sucafina NA Inc. ("Petitioner" or "Sucafina") entered into four contracts (the "NPCO Contracts") with Agrosura S.A.S. ZOMAC ("Agrosura"), a subsidiary of Green Coffee Company Holdings, LLC ("Respondent" or "GCC"), for the sale and purchase of green (unroasted) coffee. These contracts provided for binding arbitration in New York City for all disputes pursuant to the Green Coffee Association Rules.

Over time, the contractual relationship deteriorated, and on October 25, 2024, GCC sent Sucafina a letter stating that GCC "hereby (and on behalf of its subsidiary, [Agrosura]) wishes to" terminate all business relations with Sucafina globally. Dkt. 3-9 at 3. Sucafina initiated arbitration against Agrosura and GCC in January 2025. Agrosura appeared at the arbitration, but GCC refused to arbitrate. Sucafina now seeks to compel arbitration pursuant to the Convention on the Enforcement and Recognition of Foreign Arbitral Awards under 9 U.S.C. § 201 *et seq.* (the "New York Convention") and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* GCC opposes the petition on the ground that GCC is a nonsignatory to the arbitration agreement.

For the reasons that follow, the Court GRANTS Sucafina's motion to compel GCC to arbitrate.

## BACKGROUND

Petitioner Sucafina NA Inc. is the North American affiliate of the Sucafina Group, a multinational coffee merchant based in Geneva, Switzerland.  Dkt. 3 ("Menos Aff.") ¶ 4. Respondent GCC is a holding company organized under Delaware law with its principal place of business in Chicago, Illinois.  Dkt. 21 ("Jason Decl.") ¶¶ 4–5.  Agrosura is a green coffee exporter located in Colombia and is an operating subsidiary of GCC.  *Id.*; Menos Aff. ¶ 5.

Beginning in 2021, Sucafina and Agrosura signed a series of contracts for the sale and purchase of green coffee.  Menos Aff. ¶ 6 (describing the NPCO Contracts).  The NPCO Contracts provided for, among other things, "the quantity and quality of coffee to be purchased, the crop year, the price, the shipping term, and [the] shipment date(s)."  *Id.*  These agreements are "forward" contracts entered into in October 2023 for deliveries to be made from the 2023/2024 harvest in November and December 2024.  Menos Aff. ¶ 7; Dkt. 3-1.  The NPCO Contracts incorporate the Terms and Conditions of the Contract of the Green Coffee Association of New York City in force at the time the contract was executed.  Menos Aff. ¶ 6; Dkt. 3-1. These terms and conditions provide for binding arbitration in New York City pursuant to the Green Coffee Association rules.  Menos Aff. ¶ 6.  Specifically, the arbitration provision that is incorporated by reference into the NPCO Contracts states:

> All controversies relating to, in connection with, or arising out of this contract, its modification, making or the authority or obligations of the signatories, and whether involving the principals, agents, brokers, or others who actually subscribe hereto, shall be settled by arbitration in accordance with the "Rules of Arbitration" of the Green Coffee Association Inc., as they exist at the time of the arbitration (including provisions as to payment of fees and expenses).  Arbitration is the sole remedy hereunder, and it shall be held in accordance with the law of New York State, and judgment of any award may be entered in the courts of that State, or in any other court of competent jurisdiction.  All notices or judicial service in reference to arbitration or enforcement shall be deemed given if transmitted as required by the aforesaid rules.  The UN Convention on Contracts for the

International Sale of Goods shall not apply to this contract. Green Coffee Ass'n, Inc., Contract Terms and Conditions, https://greencoffeeassociation.org/wp-content/uploads/2021/09/GCA-Contract-eff-9-27-21.pdf (last visited Dec. 11, 2025).

The NPCO Contracts list Agrosura as the Seller and Sucafina as the Buyer. Dkt. 3-1. Boris Wullner Garces ("Wullner"), the General Manager for both GCC and Agrosura, Jason Decl. ¶ 13, signed his name above the Agrosura line, Dkt. 3-1. Jordan Crosthwaite ("Crosthwaite"), writing from a GCC email with the title Sales Director, GCC, negotiated the relevant price and delivery terms of these contracts with Sucafina's representatives. Menos Aff. ¶ 10; Dkt. 3-2. Crosthwaite also presented forms to Sucafina that stated that sales were "subject to business confirmation from GCC." Menos Aff. ¶ 11; Dkt. 3-2 at 12.

In late 2023 and continuing into 2024, Agrosura's coffee shipments to Sucafina were delayed. Menos Aff. ¶ 15. Crosthwaite, and later Wullner, worked to renegotiate the outstanding contracts to accommodate the shipment issues. Dkt. 3-7. After those efforts, Wullner, from a GCC email, emailed Sucafina on October 25, 2024, attaching a letter that he signed (as GCC's President) notifying Sucafina of breaches under a different set of contracts, referred to as the MPEX contracts. Menos Aff. ¶ 16; *see* Dkt. 3-9. In the letter, GCC "hereby (and on behalf of its subsidiary, [Agrosura])," notified Sucafina of the breaches and terminated all business relations with Sucafina globally. Dkt. 3-9 at 3.

Sucafina commenced arbitration against Agrosura and GCC on January 14, 2025. Menos Aff. ¶ 17. Agrosura submitted its response on April 21, 2025, but GCC has yet to respond or appear in the arbitration. *Id.* On July 10, 2025, Agrosura submitted a Waiver of Oral Hearing in the pending arbitration that was signed by Wullner at GCC. *See* Dkt. 11 ("First Marinelli Decl.") ¶ 5; Dkt. 11-3.

3

On July 11, 2025, Petitioner filed its petition and moved to compel arbitration.  *See generally* Dkt. 1 ("Pet."); Dkt. 2; Menos Aff.  The motion is fully briefed, *see* Dkt. 4 ("Br."); Dkt. 11 ("First Marinelli Decl."); Dkt. 20 ("Opp."); Dkt. 21 ("Jason Decl."); Dkt. 22 ("Second Marinelli Decl."); Dkt. 23 ("Reply"), and the Court held oral argument on December 10, 2025.

## LEGAL STANDARD

Under Section 2 of the FAA, commercial "agreement[s] . . . to submit to arbitration" are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Supreme Court has emphasized that the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'"  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505–06 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  "[B]y its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (second alteration in original) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

Still, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  "[W]hile the FAA expresses a strong federal policy in favor of arbitration," *Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008), this presumption "does not apply to disputes concerning whether an agreement to arbitrate has been made."  *Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011).

"A court faced with a petition to compel arbitration must decide two questions: Whether the parties agreed to arbitrate, and whether the claims fall within the scope of the arbitration agreement." *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 399 (S.D.N.Y. 2018) (citing *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 248 (2d Cir. 1991)). When making these determinations, courts "apply a 'standard similar to that applicable for a motion for summary judgment.'" *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). Under this standard, "the Court must grant a motion to compel arbitration if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013). If the facts in the record are undisputed and "require the matter of arbitrability to be decided . . . as a matter of law," the Court "may rule on the basis of that legal issue and avoid the need for further court proceedings." *Zachman*, 49 F.4th at 101 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)).

## DISCUSSION

The parties do not dispute that Sucafina and Agrosura agreed to arbitrate. Nor do the parties contest that Sucafina's claims against GCC and Agrosura fall within the scope of the arbitration clause. Rather, the question for the Court is whether GCC, a nonsignatory to the NPCO Contracts, should be compelled to arbitrate. GCC does not argue that there are issues of material fact or that discovery is necessary; instead, both parties assert that arbitrability may be decided here as a matter of law based on the record evidence presented.

## I.    When Nonsignatories May Be Bound to Arbitrate

A "nonsignatory party may be bound to an arbitration agreement" only if "dictated by the 'ordinary principals of contract and agency.'" *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *McAllister Bros. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)).  The Second Circuit "has recognized only 'limited theories upon which [it] is willing to enforce an arbitration agreement against a nonsignatory.'" *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (alteration in original) (quoting *Thomson-CSF*, 64 F.3d at 780).  These theories are "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF*, 64 F.3d at 776.  Only upon a "full showing" of one of these recognized theories can a court compel a nonsignatory to enter arbitration. *Tchrs. Ins. & Annuity Ass'n of Am. v. Adair*, No. 21-cv-10883 (KPF), 2023 WL 2557390, at *8 (S.D.N.Y. Mar. 17, 2023) (emphasis omitted) (quoting *Thomson-CSF*, 64 F.3d at 780).

Sucafina argues that GCC should be compelled to arbitrate either under a theory of estoppel or agency.  Br. at 10–14[1]  The Court need not address Sucafina's estoppel argument, because Sucafina has established that GCC should be compelled to arbitrate based on an agency theory.

---

[1] Sucafina also argues that its motion to compel should be granted based on the "strong federal policy" of the FAA "favoring the enforceability of arbitration agreements."  Br. 8.  But policy considerations cannot replace the requirement that a party cannot be forced to arbitrate absent express agreement or limited other circumstances such as those delineated above. *See, e.g.*, *Thomson-CSF*, 64 F.3d at 780 (overturning a district court's decision to compel arbitration under a hybrid theory of agency and veil piercing because the lower court "improperly extended the limited theories upon which [the Second Circuit] is willing to enforce an arbitration agreement against a nonsignatory").

**II.    GCC is Subject to Agrosura's Arbitration Obligations Under Agency Theory**

The Second Circuit recognizes that "[t]raditional principles of agency law may bind a nonsignatory to an arbitration agreement." *Thomson-CSF*, 64 F.3d at 777. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Optibase*, 337 F.3d at 130 (quoting Restatement (Second) of Agency § 1 (1958)). "Agency can result from 'actual' or 'true' authority . . . or 'apparent' authority, which results 'when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Monjasa A/S v. Mund & Fester GMBH & Co. KG*, 477 F. Supp. 3d 112, 118 (S.D.N.Y. 2020) (quoting *ING Bank N.V. v. Temara*, 203 F. Supp. 3d 355, 363 (S.D.N.Y. 2016)). "'[U]nless the contract explicitly excludes the principal as a party,' a court may consider extrinsic evidence to identify an unnamed principal to the contract, or to determine, more specifically, whether a nonsignatory is bound by the contract as a principal." *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 571 (2d Cir. 2020) (quoting Restatement (Third) of Agency § 6.01 cmt. c (2006)).

As an initial matter, the NPCO Contracts do not explicitly exclude GCC as a party and are not otherwise inconsistent with a finding that GCC was acting as a principal with respect to Agrosura's contractual relationship with Sucafina. *Cf. New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 233 (S.D.N.Y. 2020) (rejecting a theory of agency when one of the contract's written terms stated that it "shall not be construed to create a contractual relationship of any kind . . . between any persons or entities other than [the signatories]" (omission in original)). The Second Circuit's decision in *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, is illustrative. *Trina* concerned a contract between Trina, a solar panel manufacturer, and JRC, a Nevada-based company, that contained an arbitration clause. 954 F.3d at 569. After

a dispute arose over delivery and payment of solar panels, Trina initiated arbitration against JRC and Jasmin, JRC's Australian parent company. Jasmin claimed that, as a nonsignatory, it was not bound to the arbitration clause. *Id.* The arbitrator issued an award against both JRC and Jasmin; Trina then sought confirmation of the award. *Id*. at 569–70. In reversing the district court's confirmation of the award as to Jasmin, the Second Circuit determined that the terms of the contract could not be reconciled with JRC acting as an agent for principal Jasmin. *Id.* at 571 ("[S]everal features of the Contract persuade us that Jasmin is explicitly excluded as a principal . . . ."). For example, the contract listed two parties to the contract and then later mentioned Jasmin in the contract only as a parent company guarantor, and although "nothing in the abstract foreclose[d]" the parent from serving as a principal and a guarantor, merging the two roles would render contractual language incoherent such that a three-party contract was clearly not intended. *Id.* at 571–72. Moreover, the contract contained a third-party beneficiary clause that stated "[n]othing in this [c]ontract is intended to confer on any person who is not a party . . . any right to enforce any term of this [c]ontract." *Id.* at 572 (first alteration in original). Thus, the Second Circuit determined that finding that Jasmin was bound as a principal to the contract under an agency theory would be inconsistent with the contract's language. *Id.* at 572–73. Finally, the arbitration clause was "expressly limited to 'disputes . . . between the parties,'" which also supported a finding that Jasmin was not bound to the contract's arbitration clause specifically. *Id.* at 571.

Other than listing a buyer and a seller, no equivalent terms or clauses are present in the NPCO Contracts that would render them incoherent if GCC were found to be bound as a principal to the contract and subject to the arbitration clause under an agency theory. To the contrary, the arbitration clause here is significantly broader than the provision in *Trina*. The arbitration clause that is incorporated by reference in the NPCO Contracts states that:

8

> All controversies relating to, in connection with, or arising out of this contract, its modification, making or the authority or obligations of the signatories hereto, and whether involving the *principals*, *agents*, *brokers*, or *others* who actually subscribe hereto, shall be settled by arbitration in accordance with the 'Rules of Arbitration' of The Green Coffee Association, Inc., as they exist at the time of the arbitration . . . .

Green Coffee Association, Article I, pg. 3, https://greencoffeeassociation.org/wp-content/uploads/2020/07/PROFESSIONAL_RESOURCES-Arbitration_Rules.pdf (Amended 2021) (emphasis added); Dkt. 3-1 (incorporating by reference "the [t]erms [a]nd [c]onditions [o]f [t]he [c]ontract [o]f The Green Coffee Association [o]f New York City Inc.").

To be sure, GCC is not bound to the arbitration clause in the NPCO Contracts simply because GCC and Agrosura are affiliated companies. The Court recognizes that there are "safeguards afforded to a nonsignatory by the 'ordinary principles of contract and agency'" in order to "protect parent companies, the subsidiaries of which have entered into arbitration agreements." *Thomson-CSF*, 64 F.3d at 780. But there is much more at play here than simply a parent-subsidiary relationship, and the undisputed facts set forth in the record support a finding that GCC is bound to arbitrate under at least an apparent authority agency theory. *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (holding that principal may be bound by the actions of its agent based on actual or apparent authority).

Apparent authority "arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." *Minskoff*, 98 F.3d at 708 (alterations in original) (quoting Restatement (Second) of Agency § 27 (1958)); *accord Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 261 (S.D.N.Y. 2002). "Key to the creation of apparent authority . . . is that the third person, accepting the

9

appearance of authority as true, has relied upon it." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1462 (2d Cir. 1995) (quoting *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980)).

While apparent authority is usually a question of fact, "a principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *Minskoff*, 98 F.3d at 708; *accord Hidden Brook Air*, 241 F. Supp. 2d at 264. Based on the undisputed facts in the record, GCC's manifestations to Sucafina created a reasonable belief in Sucafina that Agrosura acted as an agent for GCC in the NPCO Contracts, and Sucafina changed its position detrimentally in reasonable reliance on that belief.

GCC's communications to Sucafina created an appearance that Agrosura was acting as an agent for GCC as the principal with respect to the NPCO Contracts. A Sales Director for GCC, Jordan Crosthwaite, acted as the primary contact with Sucafina when negotiating the NPCO Contracts. Menos Aff. ¶ 10. In the initial offer to Sucafina, Crosthwaite expressly stated that "[t]his offer is subject to business confirmation from GCC." Menos Aff. ¶ 11; Dkt. 3-2 at 11–12. Crosthwaite then negotiated the terms of the NPCO Contracts, including price and quantity, directly with Sucafina's representatives. Menos Aff. ¶ 10; Dkt. 3-2. During the negotiations, Sucafina asked Crosthwaite for "your recent financials," and Crosthwaite provided a link to GCC's audited financials along with Agrosura's statements. Dkt. 3-2 at 2; Menos Aff. ¶ 12. Wullner, the President of GCC, also signed one of the NPCO Contracts. Dkt. 3-1 at 2. Crosthwaite continued to be Sucafina's point of contact in addressing general day-to-day operations and logistics of the coffee sales, Menos Aff. ¶ 13, and he and Wullner were involved with addressing delays and deadlines, *id.* ¶ 14. Further evidencing GCC's direct involvement in the contracts was the termination letter that was sent by Wullner, as President of GCC, on behalf

of GCC "and" Agrosura to terminate all business relationships with Sucafina globally, Dkt. 3-9 at 3, and the subsequent confirmation of this termination by the CEO of GCC, Adam Jason, Dkt. 22-1.

GCC tries to distance itself from Crosthwaite by asserting that he "was hired as an independent contractor of GCC with the title 'Sales Director' and an '@gcc-coffee.com' email address" "[d]ue to complications with hiring [him] directly into Agrosura." Jason Decl. ¶ 14. GCC further asserts that "[d]espite [] Crosthwaite's title and email signature, 100 percent of his work was performed on behalf of Agrosura," and in the "opinion" of GCC's CEO, Adam Jason, "it was always clear [to Sucafina] that [Crosthwaite] was acting on behalf of Agrosura, not GCC." *Id.* These facts, however, are irrelevant to an apparent authority analysis unless GCC communicated to Sucafina that Crosthwaite did not speak for GCC. *Hidden Brook Air*, 241 F. Supp. 2d at 261 ("[I]n contrast to actual authority, apparent authority does not turn on the representations made by a principal to his agent, but rather on whether the representations made by the principal to a *third party* created the appearance of authority."). There is no evidence in the record that Sucafina was told that Crosthwaite did not represent GCC and, indeed, GCC undisputedly retained him and granted him all the trappings and titles of a GCC representative. *See, e.g.*, *Astra Oil Co., LLC v. Hydro Syntec Chems., Inc.*, No. 13-cv-08395 (ALC), 2014 WL 630676, at *1–2 (S.D.N.Y. Feb. 18, 2014) ("[B]y failing to alert Astra to the limited nature of [the employee's] authority, HSC created in [the employee] the appearance of authority to bind it in contracts with Astra.").

It is true that the mere fact that GCC and Agrosura had overlapping employees does not in and of itself establish apparent authority. *See Optibase*, 337 F.3d at 130. But the record shows that Sucafina relied on much more than simply Agrosura and GCC sharing staff. GCC's creation of apparent authority stems from Crosthwaite's representations to Sucafina, including

presenting GCC financials, referring to Agrosura and GCC interchangeably, and negotiating the contract with a GCC title without any qualifier as to his authority.  These communications from GCC to Sucafina, when taken together, demonstrate that GCC put Agrosura forward not as a mere subsidiary, but as an agent acting on GCC's behalf.

Furthermore, the record reflects that, when entering the NPCO Contracts, Sucafina reasonably and in good faith relied on GCC's representations that it had authorized Agrosura to act on GCC's behalf.  *See 99 Com. St., Inc. v. Goldberg*, 811 F. Supp. 900, 906 (S.D.N.Y. 1993) (Sotomayor, J.) ("In apparent authority cases, the words or conduct are communicated to a third party so as to lead a third party to believe that the agent acts with authority granted by the principal.").  "The reasonable appearance of apparent authority should be analyzed by examining facts known to the third party at the time of the transaction." *Adler v. Solar Power, Inc.*, No. 16-cv-01635 (LTS) (GWG), 2018 WL 1626162, at *7 (S.D.N.Y. Mar. 30, 2018).  As discussed, during the negotiation of the NPCO Contracts, Sucafina's primary point of contact was Crosthwaite, a GCC Sales Director.  *See* Dkt. 3-2.  Sucafina requested, and was provided with, both Agrosura and GCC financials.  *See* Menos Aff. ¶ 12.  Crosthwaite asserted that GCC, not Agrosura, needed to provide business confirmation for the offer.  Dkt. 3-2 at 12.  *See Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 102 (D.D.C. 2012) (finding reasonable reliance when the third party believed throughout the contract negotiations that they were negotiating with the principal even though the contract named the agent).  When Agrosura began experiencing delivery challenges, Sucafina took steps to discuss and negotiate with GCC.  Menos Aff. ¶ 13–14; Dkts. 3-6–3-8.  In these emails, Crosthwaite provided "a comprehensive update on the status of [Sucafina's] current and future shipments with GCC," emphasized that "Sucafina is a priority and important partner to GCC/Agrosura," and stated that he wanted to promote "a trusting and communicative relationship with GCC."

Dkt. 3-6 at 2.  Sucafina emailed with Crosthwaite and later GCC's President Wullner, to renegotiate contracts and amendments.  Menos Aff. ¶ 14; Dkt. 3-7.  This course of conduct hardly reflects that GCC was simply a distant parent holding company who was not involved in the Agrosura/Sucafina contractual relationship.[2]  *See Hidden Brook Air*, 241 F. Supp. 2d at 264 (estopping a principal from denying apparent authority of their agent when purchase offer created the perception of authority and principal did not repudiate or clarify its terms).  Under these circumstances, the undisputed facts establish that Sucafina reasonably relied upon the belief that Agrosura was an agent for GCC.

Finally, the undisputed facts establish that Sucafina detrimentally changed its position based on GCC's representations.  "Because the doctrine of apparent authority is based somewhat on the theory of estoppel, proof of holding out, standing alone, does not suffice for recovery." *Marfia v. T.C. Ziraat Bankasi, New York Branch*, 100 F.3d 243, 251 (2d Cir. 1996).  "There must be proof of reliance and change of position." *Id.*  Courts typically find detrimental change in position when the third party chooses to enter and perform a contract based on the belief that the signatory is an agent of the alleged principal.  *See, e.g.*, *Astra Oil*, 2014 WL 630676, at *4 (holding that a company that takes its product off the market, "thereby foregoing other opportunities to make the sale," meets the requirement for detrimental change in position).  Sucafina negotiated the NPCO Contracts directly with a representative from GCC, asked for and

---

[2] This course of conduct aligns with other public statements by GCC that portray the company as a producer of coffee in Colombia.  For example, GCC's "2024 Sustainability and Shared Value Report," describes the company as "Colombia's largest coffee producer" and claims their "operations are strategically located in the heart of Colombia's coffee-growing region."  Menos Decl. ¶ 5 (quoting *2024 Sustainability and Shared Value Report*, Green Coffee Company, https://www.greencoffeecompany.com).  The report goes on to say that "[t]hrough vertical integration and *full control* of our supply chain, GCC delivers traceability and unmatched quality to its clients in the coffee we produce at scale."  *2024 Sustainability and Shared Value Report* at 17 (emphasis added).

received financial statements from GCC as part of those negotiations, entered into a contract that required GCC approval, and negotiated with GCC when delivery issues arose.  In binding themselves to these contracts, Sucafina relied to its detriment on the representations of GCC that Agrosura was acting as its agent for the purposes of the contracts that GCC later terminated.

GCC argues that "the Second Circuit has repeatedly rejected the notion that corporate affiliation, oversight, or even active involvement in a subsidiary's business is enough to create an agency relationship for purposes of compelling arbitration against a non-signatory."  Opp. at 7.  GCC is correct that corporate affiliation alone cannot establish that a subsidiary is acting as an agent for its parent company.  *See Optibase*, 337 F.3d at 130; *see also Thomson-CSF*, 64 F.3d at 780.  However, more has been shown here, and the cases relied upon by GCC are distinguishable from the case at hand.  For example, in *Thomson-CSF, S.A. v. American Arbitration Ass'n*, the Second Circuit examined various theories under which a nonsignatory parent company could be bound to an arbitration clause in a contract entered into by its subsidiary, including agency.  64 F.3d at 777.  The court concluded that the parent could not be bound under an agency theory because the contract was entered into "well before" the parent purchased the subsidiary.  *Id.*  Similarly, in *Phoenix Companies, Inc. v. Abrahamsen*, No. 05-cv-04894 (WHP), 2006 WL 2847812 (S.D.N.Y. Sept. 28, 2006), a district court rejected a finding of agency where "[the parent company] did not exist when [a subsidiary] entered into the [the agreement at issue] and accordingly, [the subsidiary] could not have been acting as [the parent's] agent in executing those agreements."  *Id.* at *6.  That is not the case here.

Finally, in *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, the Second Circuit acknowledged that agency was a recognized theory under which a nonsignatory could be bound to an arbitration agreement.  337 F.3d at 131–32 ("[The party seeking arbitration] has failed to adduce facts that would support any of the five recognized theories on which [the party resisting

14

arbitration] could be forced to arbitrate in the absence of an agreement."). That case involved two affiliate companies that used the same logos, offered similar products, shared officers, presented themselves as one firm, and were owned by the same parent company. *Id.* at 128. The Second Circuit agreed with the district court that no agency relationship had been shown based simply on the "mutual benefits derived from affiliation" of the two corporate affiliates owned by the same company. *Id.* at 130. Here, there is much more than a mutually beneficial corporate affiliation between GCC and Agrosura.

In contrast to the foregoing cases, GCC was directly involved in the negotiation and performance of the contract containing the arbitration clause that was signed by its subsidiary, Agrosura. GCC made assertions to Sucafina that led Sucafina to conclude that Agrosura was acting as GCC's agent in the transaction, Sucafina reasonably and in good faith relied on these assertions when entering the NPCO Contracts, and Sucafina changed its position to its own detriment. Thus, agency is established here not because of GCC and Agrosura's parent-subsidiary relationship, but instead because of GCC's involvement in the contracts at issue.

In sum, the undisputed facts establish a full showing of agency, so GCC is bound by the NPCO Contracts' arbitration clause. This does not mean, however, that Agrosura is not also bound to arbitrate. As the Second Circuit recognized in *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999), an agent of a disclosed principal can still be liable for a contract when it acted, "at least in part, on its own behalf when it contracted with [the third party]." *Id.* at 353 ("In many cases the agent is a party to the contract made by him on behalf of a disclosed principal and, as such, is responsible for its performance." (quoting Restatement (Second) of Agency § 328 cmt. b (1958))). Here, Agrosura was acting in part on its own behalf when it contracted with Sucafina, and thus both Agrosura and GCC are bound to arbitrate.

15

## CONCLUSION

For the reasons stated above, the Court GRANTS Petitioner's motion to compel GCC to arbitration. The action is accordingly stayed pending the arbitration. *See Nicosia*, 834 F.3d at 229.

Dated: December 16, 2025
      New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge

16